Pogue v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-156-CR

MICHAEL JAROD POGUE APPELLANT

V.

THE STATE OF TEXAS STATE 

------------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Introduction & Procedural Background

Michael Jerod Pogue appeals from his conviction for aggravated sexual assault of a child under fourteen.  In ten points, appellant (1) challenges the legal sufficiency of the evidence to support his conviction and complains that the trial court (2) improperly denied his motion for new trial, (3) improperly excluded certain evidence, (4) erroneously overruled his motion for mistrial based on improper prosecutorial jury argument, (5) improperly denied his challenge for cause of a veniremember, (6) misstated the definition of reasonable doubt in the jury charge, (7) erroneously allowed the State to ask prospective jurors commitment questions during voir dire, (8) imposed a sentence that constitutes cruel and unusual punishment, (9) coerced the jury into returning a verdict, and (10) improperly denied his motion to sever the six-count indictment.  We affirm.

Appellant was tried and convicted for the sexual assault of his twelve-year-old daughter, B.P.  Appellant was charged with one count of indecency with a child and five counts of aggravated sexual assault of a child.  A jury found appellant not guilty of all but one count of aggravated sexual assault.  The jury assessed punishment, enhanced by two prior felony convictions, at ninety-nine years’ confinement. 

Motion for Instructed Verdict

In his first point, appellant complains that the trial court improperly overruled his motion for an instructed verdict because the evidence is insufficient to support the jury’s verdict of guilty on the one aggravated sexual assault offense for which he was convicted.  Appellant asserts that B.P. was not a credible witness because of her conflicts with her parents and her reputation for being untruthful and that B.P.’s half-brother G.B., who testified to observing the assault, could not be precise regarding when the assault occurred. 

A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence.
(footnote: 2) 
 In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
(footnote: 3) 

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.
(footnote: 4) 
 The trier of fact is the sole judge of the weight and credibility of the evidence.
(footnote: 5) 
 Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.
(footnote: 6) 
 We must resolve any inconsistencies in the evidence in favor of the verdict.
(footnote: 7) 
 
The standard of review is the same for direct and circumstantial evidence cases.
(footnote: 8) 

To establish that appellant committed the assault for which he was convicted, the State had to prove that appellant intentionally or knowingly caused B.P.’s sexual organ to contact appellant’s sexual organ or caused the penetration of B.P.’s sexual organ by appellant’s sexual organ, and that B.P. was a child under fourteen who was not appellant’s spouse.
(footnote: 9)  A child victim’s uncorroborated testimony is sufficient to support a conviction for a sexual offense.
(footnote: 10)
 B.P. was thirteen years old when she testified at trial.  She testified as follows:  During the previous year, appellant had put his penis “on” or “in” her vagina five or six times.  On at least one occasion, appellant had gotten on top of her, put his penis in her vagina, and moved up and down.  Once, when B.P. tried to close her legs, appellant said, “Open up for Daddy.”  Appellant had also “licked [B.P.’s] vagina” once or twice. 

These events occurred at night, either in the living room or in B.P.’s bedroom, which she shared with her grandfather.  B.P.’s grandfather did not wake up, but B.P.’s mother, who was pregnant and sleeping in another room, sometimes got up to use the restroom.  When she did, appellant would leave B.P.’s bedroom and go to her mother’s bedroom. 

During the time these events were occurring, in late April 2003, B.P., who was usually an A-B student, received a report card with “a bunch of C’s” on it.  B.P.’s brother G.B. said that it was not normal for B.P. to receive such low grades, that he “knew what was going on,” and that he would tell their mother unless B.P. did.  When B.P. did not report the incidents to her mother, G.B. told their grandfather who, in turn, told their grandmother.  B.P. then told her grandmother, aunt, and uncle about the assaults, and they took her to the hospital. 

At the hospital, B.P. was interviewed by Denton Police Officer Virginia Nichols.  Officer Nichols testified that B.P. was “pretty upset” and, although “very reluctant” to talk to her at first, eventually alleged that she was the victim of ongoing sexual assaults.  B.P. reported that the most recent assault had occurred the day before but had just involved fondling.  Because Officer Nichols did not believe any DNA evidence would be present after fondling and because no sexual assault nurse examiner (SANE) was immediately available, no medical examination was conducted at that time.  Instead, Officer Nichols took B.P. to the police station so Detective Brian Lee could continue the investigation. A week later, B.P. was examined by SANE Lorna Doan.  Doan testified that B.P. reported that appellant had, on more than one occasion, inserted his fingers and penis into her vagina, licked her vagina, and touched her breasts. During her examination, Doan found no evidence of trauma to the labia majora, labia minora, or the vagina.  She further testified, however, that transsections of B.P.’s hymen showed that she had been penetrated into the vagina with something large enough to tear the hymen and that the tears were consistent with the history that B.P. gave of her father having intercourse with her on more than one occasion.   Doan could not pinpoint the exact age of the tears but she testified that the tears were healed, which indicated that they had occurred over a week, and probably at least two weeks or more, before the date of the examination.
(footnote: 11) 

Finally, B.P.’s eleven-year-old brother, G.B., testified that appellant went into B.P.’s bedroom every time appellant and B.P.’s mother had an argument. G.B. further testified that, one night while everyone was asleep, he saw appellant get on top of B.P. in the living room and begin moving his body up and down.  G.B. later told B.P., “I seen what happened,” and told her that they should tell their mother that appellant was “humpin’” B.P.  G.B. testified that B.P. told their grandmother because he had said he would tell if she did not.
(footnote: 12)
 From this evidence, the jury could have found the essential elements of the charged offense beyond a reasonable doubt.
(footnote: 13)
 There is also contrary evidence.  For example, appellant testified that he had never assaulted B.P., and he described B.P. as rebellious and angry over the discipline she had received for making poor grades.  B.P.’s mother Katrina also testified that B.P. never mentioned the alleged assaults until the day she was disciplined over her report card.  Katrina confirmed that B.P. did not like being disciplined, especially by appellant.  In addition, appellant’s sister testified that B.P. had a bad reputation for being untruthful.

Further, B.P. acknowledged on cross-examination that she had first told her grandparents about the alleged assaults on the same day that she was disciplined for receiving a poor report card and that her mother knew nothing about the alleged assaults until after B.P. reported them to the police.  B.P. also admitted lying to appellant about her report card for fear of being punished for it, and she admitted she had told Detective Lee that she was upset with appellant over being disciplined and not being able to go to the movies.  B.P. further acknowledged that she wanted to go live with her grandmother due to tension between her and her parents over some of her friends.  In addition, B.P. admitted that there were discrepancies between her trial testimony and the written statement she had given Detective Lee.  For example, contrary to her trial testimony, B.P. had told Detective Lee that G.B.’s response to her allegations of sexual assault was, “You’re lying to me.”

Although there are some conflicts in the evidence, they were for the jury to resolve.
(footnote: 14)  When performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder.
(footnote: 15)  Accordingly, because the evidence is legally sufficient to support the jury’s verdict, we hold that the trial court did not err by overruling appellant’s motion for an instructed verdict.  We overrule appellant’s first point.

Motion for New Trial

In his second point, appellant complains that the trial court violated his constitutional right to due process by improperly overruling his motion for new trial, which was based primarily on B.P.’s total recantation of her allegations against appellant. 

“A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial.”
(footnote: 16)  Under this statute, a defendant is entitled to have his motion for new trial granted if (1) the newly discovered evidence was unknown to him at the time of trial;  (2) his failure to discover the new evidence was not due to his lack of due diligence;  (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching;  and (4) the new evidence is probably true and will probably bring about a different result in a new trial.
(footnote: 17)
 The trial court has discretion to decide whether to grant a new trial based upon newly discovered evidence, and its ruling will not be reversed absent an abuse of discretion.
(footnote: 18) 
 The trial court's discretion extends to situations in which the newly discovered evidence is the retraction of a witness's trial testimony.
(footnote: 19)  
Likewise, the trial judge determines the credibility of the witnesses and whether the new evidence is probably true.
(footnote: 20) 

The “probably true” requirement simply means “that the whole record presents no good cause to doubt the credibility of the witness whose testimony constitutes the new evidence, either by reason of the facts proven at the trial or by the controverting affidavits on the motion, or otherwise.”
(footnote: 21) 
 The trial court acts within its discretion in disbelieving a recantation as long as the record provides some basis for disbelieving the testimony.
(footnote: 22) 
 Such bases include, but are not limited to, evidence that the recanting witness was subject to pressure by family members or threats from co-conspirators, evidence showing part of the recantation to be false, circumstances showing that the complainant recanted after moving in with family members of the defendant, and an accomplice’s recantation after being convicted.
(footnote: 23) 

In this case, there is evidence that B.P. was pressured by family members into recanting.  For example, the testimony of B.P.’s mother, Katrina, at the new trial hearing indicates that B.P. never broached the subject of appellant’s alleged abuse with her mother; instead, the few conversations between the two of them about the matter, including B.P.’s alleged recantation, were initiated by Katrina.  Katrina testified as follows:

I’ve been asking her all the way through to talk to me, and do you want counseling?  And nothing.  So I’m not going to push her.  When she’s ready she’ll come.

. . . .

She just didn’t want to talk about it.  I extended myself and she’s just—I’m assuming . . . but maybe she’s just not ready or she doesn’t want to.  I don’t know.

. . . .

She really won’t elaborate on it.  In the beginning, I was upset and I really wanted to—I wanted answers.  And she would tell me, mama, I really don’t want to discuss it.  I really don’t want to talk about it.  And I responded to her and I’d tell her, I need to know. I need answers. 

Katrina further testified that, on the two or three occasions that B.P. had agreed to discuss the matter with her—“never, never in a detail of any type”—B.P. had consistently stated that she wanted everyone to believe what she had said in court.  Then, about three weeks after appellant’s trial ended, at Katrina’s birthday celebration, she noticed that B.P. was being especially quiet and raised the subject again.  She asked B.P., “[D]oes this have something to do with your dad’s recant?”  At that point, according to Katrina, B.P. stated, “[H]e didn’t do it, but I don’t want to go back to court.”  B.P. did not elaborate on this statement. 

In light of all this testimony, even defense counsel suggested to Katrina that she seemed to have been putting pressure on B.P., which Katrina denied. B.P. also testified at the hearing and stated that all of her allegations and trial testimony against appellant regarding the alleged sexual abuse had been false.  She testified that she had made up the allegations because she was angry with appellant for “shaming” her and her family by cheating on her mother and fathering “brothers and sisters and people I didn’t even know about.”
(footnote: 24)  She stated, “The reason I’m coming forward and telling the truth is because I don’t think anyone should have to serve this time in jail for something that he didn’t do.” 

B.P. denied that anyone had pressured her into recanting.
(footnote: 25)  She further testified, however, that when she and the rest of her family went to visit appellant in jail after his conviction, “[h]e really didn’t even talk to me.  He talked to my brothers and my mom.”  B.P. also testified that she and her brothers missed her father, that her mother was sad and depressed,
(footnote: 26) and that she knew her baby sister would never know their father.  She stated that she had decided to say she had lied when she learned that her father had received a ninety-nine-year sentence. 

There are also inconsistencies in the record that tend to show the recantation to be false.  For instance, Katrina testified that B.P. told her, “[H]e didn’t do it, but I don’t want to go back to court.”  B.P., on the other hand, testified that she told her mother, “He didn’t do it,” and “I told [my mom] I would come back here and tell the truth.” 

In addition, B.P. testified at trial that she had told Detective Lee she was angry with her father over being disciplined and upset over not being allowed to go to the movies or do what she wanted to do.  This testimony is inconsistent with B.P.’s stated reason at the new trial hearing for her anger with her father:  that he had “shamed” her and her family by cheating on her mother and fathering children with another woman.  

Further, B.P. could name only one sibling that appellant had fathered during his extramarital affair, a year-old sister whose existence B.P. had discovered “[d]uring the middle” of 2003, “[m]aybe a little” before summer.  The date of this discovery appears to post-date B.P.’s outcry regarding the sexual abuse, which occurred on April 25, 2003. 

Moreover, Katrina’s and B.P.’s testimony regarding B.P.’s alleged recantation did not account for some of the other evidence of appellant’s guilt that was presented at trial.  B.P. testified at the new trial hearing that she had told her brother G.B.—falsely—that her dad had been touching her, that G.B. had then told their grandmother, “and we ended up here in court.”  But  B.P. denied having any conversations with G.B. about the case or telling him how to testify.  

B.P.’s alleged lie to G.B. is inconsistent with his trial testimony.  G.B. testified that he had seen appellant “humpin’” B.P. one night and later approached 
her
 
and threatened to tell their mother if B.P. did not.  After that, according to G.B., B.P. told their grandmother about the alleged assaults.  G.B. also testified that he’d seen appellant go into B.P.’s bedroom every time appellant and Katrina had a fight. 

Finally, B.P. testified that she would “truly disbelieve” Nurse Doan’s trial testimony that her examination of B.P. showed her hymen had been penetrated.  Although she claimed to understand that penetration of her hymen meant she’d had some sort of sexual intercourse or sexual activity, B.P. flatly denied that any penetration or sexual activity had occurred. 

At the close of the hearing, the trial court denied appellant’s motion for new trial, finding that “the circumstances of the recantation cast doubt on its validity.”  Specifically, the trial court noted its reliance on Katrina’s and B.P.’s testimony and demeanor at the new trial hearing, as well as everything that was presented at trial.

For the reasons we have just discussed, we hold that the trial court did not abuse its discretion by disbelieving B.P.’s recantation and concluding that it was probably not true.
(footnote: 27)  We overrule appellant’s second point.

Excluded Evidence

In his third point, appellant complains that the trial court deprived him of his constitutional right to a fair trial by prohibiting him from presenting relevant and exculpatory evidence to the jury regarding B.P.’s tendency to lie and her possible sexual activity with two of her boyfriends.  Appellant contends that this evidence undermined B.P.’s credibility, demonstrated B.P.’s bias and her motive for making false accusations against him, and provided a reasonable explanation for the State’s scientific evidence regarding the penetration of B.P.’s hymen. 

In response, the State sets forth a thorough and detailed analysis, explaining each proffer of evidence by appellant in the context of the witness who was on the stand; the basis upon which each proffer was made; the trial court’s ruling and the basis for it, if mentioned on the record; the evidence the jury was allowed to hear from each witness; and why the excluded evidence was properly excluded.  The evidence and the propriety of the trial court’s rulings are summarized below.

In a prosecution for aggravated sexual assault, evidence of specific instances of an alleged victim’s sexual behavior is not admissible unless the evidence is necessary to rebut or explain medical evidence offered by the State, relates to the alleged victim’s motive or bias, or is constitutionally required to be admitted.
(footnote: 28)  In addition, the probative value of the evidence must outweigh the danger of unfair prejudice.
(footnote: 29)
 The Sixth Amendment and Texas Rule of Evidence 613 also protect a defendant’s right to cross-examine a witness regarding bias or motive.
(footnote: 30)  Therefore, a defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to testify.
(footnote: 31)  But the trial court has broad discretion to limit cross-examination in order to avoid harassment, prejudice, confusion of the issues, endangering the witness, the injection of cumulative or collateral evidence, and marginally relevant interrogation.
(footnote: 32)
 We review the trial court’s exclusion of evidence under an abuse of discretion standard.
(footnote: 33)  A trial court does not abuse its discretion unless its ruling is arbitrary and unreasonable and therefore outside the zone of reasonable disagreement.
(footnote: 34)  The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.
(footnote: 35)
 In this case, appellant sought to introduce evidence regarding B.P.’s relationships with two different boys and her actions and comments involving two cousins.  That evidence is as follows:

In the summer or fall of 2002, B.P. had received a letter from a neighborhood boy named Larry, whom B.P. considered to be her boyfriend.  At that time, B.P. was eleven years old, and Larry was thirteen. 

In the letter, Larry described how big his penis was, told B.P. he was going to give her some of his “long dong,” and said that B.P. was scared to have sex with him.  B.P. wrote back that Larry was “just a horn frog,” that she was “not scared of it,” that her “p----” would swallow him up, and that they did not have time for sex. 

When appellant and Katrina discovered the letter, appellant “whipped her,” which B.P. did not like.  In addition, B.P. was grounded for two weeks.
(footnote: 36) On cross-examination outside the jury’s presence, B.P. admitted receiving and responding to the letter, but she denied having sexual intercourse or penile-vaginal contact with Larry. 

Next, appellant sought to introduce evidence regarding B.P.’s relationship with a boy named Derek.  At the time of trial, B.P., who was thirteen and in the seventh grade, had a boyfriend named Derek who was in the tenth grade.  B.P.’s parents did not approve of Derek or of some of B.P.’s middle school-aged girlfriends because they were dating much older boys.  Katrina testified that she and appellant refused to allow B.P. to date Derek and told B.P. not to “hang out” with the girlfriends whom they believed were a bad influence on her.  According to Katrina, B.P. was quite upset at first but “came to terms with it” after a couple of weeks.  Katrina testified that these events occurred before and during the first part of her pregnancy. 

Much later, in February 2004, the month before trial, Katrina had taken B.P. to get a pregnancy test because of a letter she had found in B.P.’s pocket which said that B.P. was pregnant by Derek and debating whether she should tell him or keep it a secret.  B.P. denied having sexual intercourse or penile-vaginal contact with Derek.  She explained that the note was a joke and had been written by a girlfriend at school.  Katrina testified that, based on the handwriting in the letter, she had doubts about whether B.P. had written it and did not believe that B.P. was actually pregnant.  But she took B.P. for a pregnancy test “just to assure myself.” 

Appellant also sought to introduce evidence regarding B.P.’s actions towards and conversation with two of her cousins.  B.P.’s cousin Tevin testified that B.P. had touched him more than once on his private parts, including his penis, and it made him uncomfortable.  Tevin could not, however, remember when the touching occurred, except that it “may” have occurred “within the last year or two.” 

B.P.’s cousin Shonquinta testified that B.P. had told her of exchanging notes with a boyfriend named William and had once stated, without elaboration, that she’d had sex with him on a table at the park.  Shonquinta testified that B.P. made this statement before appellant went to jail,
(footnote: 37) but she could not remember exactly when. 

Finally, appellant sought to introduce Katrina’s equivocal testimony that B.P. can be trustworthy about a lot of things but will lie sometimes, “sort of depend[ing] on what the situation is.”  Regarding B.P.’s allegations against appellant, Katrina testified that she did not know what to believe but wanted “closure.” 

Over appellant’s objections, the trial court excluded all of this evidence.   This evidence shows that the incident involving Larry occurred in the summer or fall of 2002, several months before B.P.’s outcry in late April 2003 and her medical examination a week later.  Moreover, neither the “letter” involving Derek nor the pregnancy test occurred until well after the outcry and the medical examination.  In addition, neither of B.P.’s two cousins testified that her alleged conduct involving them occurred before April 2003.  Thus, the trial court could have determined, based on the chronology of these events, that they did not explain the State’s medical evidence regarding the penetration of B.P.’s hymen in approximately late April 2003.

Further, although the trial court excluded Katrina’s equivocal testimony about B.P.’s veracity, B.P.’s aunt was allowed to testify that B.P. had a bad reputation for being untruthful, and B.P. herself admitted lying to appellant about her report card. 

For these same reasons, the trial court reasonably could have concluded that these matters had, at best, marginal relevance to B.P.’s alleged motive to testify falsely against appellant, that they would have unduly harassed B.P. and confused the issues, and that the danger of unfair prejudice from this evidence would have outweighed its probative value.  Accordingly, we hold that the trial court did not abuse its discretion or deprive appellant of his constitutional right to a fair trial by excluding the contested evidence.  We overrule appellant’s third point.

Motion for Mistrial

In his fourth point, appellant complains that the trial court improperly denied his motion for mistrial based on the following prosecutorial jury argument during the punishment phase of trial:  “[B.P.] will be 45 years old some day, sitting on a jury panel, and somebody will ask her about sexual assault, and she will start crying.”  Appellant contends that the trial court’s instruction to the jury to disregard this was insufficient to eliminate the harm of the remark because the jury assessed his punishment at ninety-nine years in prison. 

When the trial court sustains an objection to jury argument and instructs the jury to disregard but denies a defendant’s motion for a mistrial, the issue is whether the trial court abused its discretion in denying the mistrial.
(footnote: 38)  Only in extreme circumstances, in which the prejudice caused by the improper argument is incurable, i.e., “so prejudicial that expenditure of further time and expense would be wasteful and futile,” will a mistrial be required.
(footnote: 39)  In determining whether the trial court abused its discretion in denying the mistrial, we consider (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the punishment assessed absent the misconduct.
(footnote: 40)
 Assuming, for argument’s sake, that the complained-of remark was improper, we hold that the trial court did not abuse its discretion by denying a mistrial.  The remark was only one sentence in the State’s closing argument, and the trial court’s instruction to disregard was immediate.  Therefore, the trial court reasonably could have concluded that the remark would have little prejudicial effect on appellant.  Further, the gravity of the offense, appellant’s culpability, and his prior felony convictions all contributed to the certainty of the punishment assessed, even absent the complained-of remark.
(footnote: 41)  Accordingly, we overrule appellant’s fourth point.

Challenge for Cause

In his fifth point, appellant complains that the trial court violated his constitutional right to an impartial jury that could follow the law when it overruled his challenge for cause to veniremember Douglas Brincks.  Appellant asserts that Brincks’s answers during voir dire indicated that (1) he was biased or prejudiced against the legal principle that a defendant’s failure to testify cannot be used against him and (2) he could not be fair and impartial due to his personal experiences—being concerned for his children in day care and having once dated a woman who had been assaulted. 

A veniremember may be challenged for cause if he has a bias against any of the law applicable to the case upon which the defendant is entitled to rely.
(footnote: 42)  If a prospective juror is biased as a matter of law, he must be excused when challenged, even if he states that he can set aside his bias and provide a fair trial.
(footnote: 43)  But the trial court has discretion to determine whether bias exists.
(footnote: 44)  A venireperson who has indicated that he may hold a defendant’s failure to testify against him can be rehabilitated.
(footnote: 45)  Thus, when a juror states he believes that he can set aside any influences he may have, and the trial court overrules a challenge for cause, its decision will be reviewed in light of all of the answers the prospective juror gave.
(footnote: 46)
 In this case, Brincks stated initially that he “would have to weigh” the fact that a defendant did not testify in order to defend himself.  He also stated that he was not sure he could be impartial because he had often worried about whether his own children could be molested in day care and he had once dated a woman who had “really flipped out” after being assaulted. 

Upon further questioning, however, Brincks stated that he understood that a defendant has the right not to testify and that he would follow the court’s instruction not to hold it against appellant if he did not testify.  In addition, Brincks stated several times that he could, and would, decide this case based solely on the evidence he heard in the court room, not based on appellant’s failure to testify or Brincks’s or his friend’s personal experiences. After considering all of Brincks’s answers, we hold that the trial court did not abuse its discretion or violate appellant’s constitutional rights by overruling his challenge for cause to Brincks.
(footnote: 47)  We overrule appellant’s fifth point.

Reasonable Doubt Definition

In his sixth point, appellant contends that the trial court violated his constitutional right to a fair trial by submitting the following “reasonable doubt” instruction to the jury during the guilt/innocence phase of trial:

It is not required that the prosecution proves guilt beyond all possible doubt; it is required that the prosecution’s proof excludes all “reasonable doubt” concerning the defendant’s guilt. 

Appellant asserts that this instruction is a misstatement of the law and should not have been given. 

The court of criminal appeals has rejected this argument, as have we.
(footnote: 48)  Therefore, we overrule appellant’s sixth point.

“Commitment” Questions

In his seventh point, appellant asserts that the trial court violated his constitutional right to a fair trial by improperly allowing the prosecutor to ask prospective jurors the following “commitment” questions during voir dire.

[PROSECUTOR]:  Ms. Mendez, how do you think that would—how would that affect a family if that were an accusation that was made involving a family?

. . . .

VENIREPERSON MENDEZ:  Traumatize the family.

[PROSECUTOR]:  Okay.  Make it difficult for everybody involved?

VENIREPERSON MENDEZ:  Very much so. 

Appellant contends that these questions were improper because they detailed the facts of this case and asked Mendez and other potential jurors to commit to convict in a situation in which one family member accused another family member of molesting him or her.  We disagree.

Commitment questions are those that ask a prospective juror to commit to resolving, or to refrain from resolving, an issue a certain way based on one or more facts contained in the question.
(footnote: 49)  The challenged questions in this case did not ask Mendez to commit regarding a conviction, nor did they ask her to resolve or to refrain from resolving any issues in the case.
(footnote: 50)  Accordingly, we overrule appellant’s seventh point.

Length of Sentence

In his eighth point, appellant complains that the trial court violated the constitutional prohibition against cruel and unusual punishment by sentencing him to ninety-nine years’ confinement.  Although appellant’s sentence is within the statutory range,
(footnote: 51) he contends that it is grossly disproportionate to the offense committed because he was convicted on only one count of a six-count indictment, the evidence showed that he loved B.P. and his family and wanted the best for them, and his conduct during his presentencing confinement showed that he was remorseful, was trying to rehabilitate himself, and was trying to help others avoid similar mistakes.

Generally, punishment assessed within statutory limits is not excessive, cruel, or unusual.
(footnote: 52)  A narrow exception to this rule is recognized when the sentence is grossly disproportionate to the offense.
(footnote: 53)
 In 
Solem v. Helm,
 the Supreme Court identified three criteria to be used to evaluate the proportionality of a particular sentence.
(footnote: 54)  They are (1) the gravity of the offense and the harshness of the punishment, (2) the sentences imposed on other criminals in the same jurisdiction, and (3) the sentences imposed for the same offense in other jurisdictions.
(footnote: 55)  In a proportionality analysis, we first make a threshold comparison of the gravity of the offense against the severity of the sentence.
(footnote: 56)  We judge the gravity of the offense in light of the harm caused or threatened to the victim or society and the culpability of the offender.
(footnote: 57)  Only if we determine that the sentence is grossly disproportionate to the offense do we consider the remaining 
Solem
 factors.
(footnote: 58)
 Appellant was convicted of a particularly grave offense—sexually assaulting his twelve-year-old daughter.  It is beyond question that this conduct would have resulted in tremendous actual and threatened harm to B.P.
(footnote: 59)  Likewise, the potential harm to society stemming from incest cannot seriously be questioned.

In addition, appellant’s culpability is significant.  The jury found that he used his sexual organ to contact or penetrate B.P.’s sexual organ, and it was entitled to consider that B.P. had to undergo the agony of testifying about the assault and being accused by her father of lying about it. Finally, although the charged offense, alone, carried a punishment range of five to ninety-nine years or life,
(footnote: 60) the jury also found that appellant had two prior felony convictions. Further, the State put on proof at the punishment phase that appellant previously had been convicted of five felony offenses.
(footnote: 61)
 Based on all of these factors, we hold that appellant’s ninety-nine-year sentence is not grossly disproportionate to the offense of which he was convicted.
(footnote: 62)  Accordingly, the trial court did not violate appellant’s constitutional rights by imposing the sentence.  We overrule appellant’s eighth point.

Jury Verdict

In his ninth point, appellant contends that the trial court violated his constitutional right to a jury trial by announcing to the jury, after several hours of deliberation, that the jury was about to be sequestered, thereby coercing a verdict.  

The record shows that the jury began its deliberations on guilt/innocence at 2:25 p.m. and returned a verdict at 10:55 p.m.  During that time, the trial court made one response to a jury note, which appellant does not challenge.

At the hearing on appellant’s motion for new trial, he testified that he had no knowledge of any jury breaks.  Appellant further testified that the trial judge informed everyone 
in the courtroom
 that she was going to sequester the jury. Appellant conceded that this decision was made at his request.  The jury was not in the courtroom at the time; the bailiff had gone to get the jury.

After the trial court made this announcement, she was informed that the jury had reached a verdict.  When the jury returned to the courtroom, some of the jurors looked upset, tired, or confused.  Each of the jurors stated during polling, however, that the verdict was a correct reflection of his or her vote on each count in the indictment. 

This evidence does not show that the trial court coerced the jury into reaching a verdict by threatening sequestration.  There are many reasons why the jurors could have appeared tired, upset, or confused, including the complexity of the case, the lateness of the hour, and the gravity of the charged offenses.  Accordingly, we overrule appellant’s ninth point.

Request for Severance

In his tenth point, appellant asserts that the trial court deprived him of a fair trial by denying his motion to sever the six-count indictment.  Appellant contends that he had the right to a severance upon request.  He also complains that the trial court’s denial of his motion resulted in his character being smeared generally, prevented him from establishing a defense to the specific allegations, and may have caused the jury to return a nonunanimous verdict.

A defendant may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode.
(footnote: 63)  Whenever two or more offenses have been consolidated or joined for trial, the defendant has a right to a severance of the offenses.
(footnote: 64)  The right to a severance does not apply, however, to aggravated sexual assault offenses committed against a child under seventeen unless the trial court determines that the defendant would be unfairly prejudiced by the joinder.
(footnote: 65)  We review a trial court’s ruling on a motion to sever under an abuse of discretion standard.
(footnote: 66)
 Evidence of extraneous offenses committed by the defendant against a child victim is admissible to show the previous and subsequent relationships between the defendant and the child and their respective states of mind.
(footnote: 67)  Further, evidence of other crimes may be admitted if it rebuts a defensive theory, such as appellant’s theory in this case that B.P. had concocted the charges against him.
(footnote: 68)  Thus, even if appellant's cases had been tried separately, it is probable that evidence regarding the counts on which he was acquitted would have been admissible to show his and B.P.’s relationship and to refute his defensive theory that B.P. had made up her allegations because she had been disciplined for receiving poor grades.

Finally, the record shows no danger that the trial court’s refusal to sever resulted in a nonunanimous verdict.  To the contrary, the jury returned separate, unanimous verdicts on each of the six counts in the indictment, and, as we have noted, each juror stated upon polling that the respective verdicts correctly reflected their votes.  Accordingly, for all of these reasons, we hold that the trial court did not abuse its discretion by denying appellant’s motion to sever.  We overrule appellant’s tenth point.

Conclusion

Having overruled all of appellant’s points, we affirm the trial court’s judgment.

PER CURIAM

PANEL F: CAYCE, C.J.; WALKER and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: September 22, 2005

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
McDuff v. State
, 939 S.W.2d 607, 613 (Tex. Crim. App.), 
cert. denied,
 522 U.S. 844 (1997); 
Franks v. State
, 90 S.W.3d 771, 789 (Tex. App.—Fort Worth 2002, no pet.). 

3:
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Ross v. State
, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).

4:
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789. 

5:
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 

6:
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000). 

7:
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).
 

8:
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).
 

9:
See
 
Tex. Penal Code Ann.
 § 22.021(a)(1)(B)(i), (iii), (2)(B) (Vernon Supp. 2004-05).

10:
Tex. Code Crim. Proc. Ann.
 art. 38.07 (Vernon 2005); 
West v. State,
 121 S.W.3d 95, 111 (Tex. App.—Fort Worth 2003, pet. ref’d).

11:
One week before the examination would have been April 25, 2003; two weeks before would have been April 18, 2003.  B.P. first reported the alleged assaults on April 25, 2003. 

12:
Contrary to B.P.’s testimony, G.B. testified that he did not tell the children’s grandfather.  Appellant suggests that G.B.’s testimony is not credible because he could not be precise regarding when he observed the assault and, from the way the living room was configured, it would have been impossible for G.B. to observe the assault as he testified.  G.B. testified, however, that the assault occurred while the children’s mother (appellant’s wife) was pregnant with their younger sister.  This time frame is consistent with B.P.’s testimony. Moreover, appellant does not direct us to any evidence regarding the configuration of the living room.  G.B. did not testify regarding the room configuration.

13:
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Ross
, 133 S.W.3d at 620.

14:
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04; 
Margraves
, 34 S.W.3d at 919.

15:
Dewberry
, 4 S.W.3d at 740.

16:
Tex. Code Crim. Proc. Ann.
 art. 40.001 (Vernon Supp. 2004-05).

17:
Wallace v. State,
 106 S.W.3d 103, 108 (Tex. Crim. App. 2003); 
Keeter v. State,
 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002).

18:
Keeter,
 74 S.W.3d at 37; 
Jones v. State,
 711 S.W.2d 35, 36 (Tex. Crim. App. 1986). 

19:
Keeter,
 74 S.W.3d at 37.

20:
Id.

21:
Id.
 at 38 (quoting 
Jones,
 711 S.W.2d at 37 n.4). 

22:
Id.

23:
Id.

24:
Conversely, appellant’s theory at trial was that B.P. had made up the allegations because she was angry over being disciplined for a poor report card. 

25:
At trial, B.P. testified that appellant had asked her to say that her allegations of sexual assault were not true and that she had only made them because she was mad at him.  At the new trial hearing, however, B.P. stated that this trial testimony had been false.

26:
Although Katrina testified that she planned to divorce appellant, she admitted that she had visited him five or more times in the two months following his trial, because “I don’t kick a person when they’re down.” 

27:
See Keeter,
 74 S.W.3d at 37-38.

28:
Tex. R. Evid.
 412(b)(2)(A), (C), (E); 
see also
 
Tex. R. Evid.
 608(b) (providing that specific instances of conduct may not be used to attack or support a witness’s credibility).  The other two exceptions to these rules—the alleged victim’s past sexual behavior with the accused and evidence that the victim has been convicted of a crime—have no application to this case.  
Tex. R. Evid.
 412(b)(2)(B), (D), 608(b).

29:
Tex. R. Evid.
 412(b)(3).

30:
Davis v. Alaska,
 415 U.S. 308, 315-17, 94 S. Ct. 1105, 1110-11 (1974); 
Tex. R. Evid.
 613(b).

31:
Carpenter v. State,
 979 S.W.2d 633, 634 (Tex. Crim. App. 1998); 
Carroll v. State,
 916 S.W.2d 494, 497 (Tex. Crim. App. 1996).

32:
Carpenter,
 979 S.W.2d at 634; 
Lagrone v. State,
 942 S.W.2d 602, 613 (Tex. Crim. App.), 
cert. denied,
 522 U.S. 917 (1997).

33:
Weatherred v. State,
 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

34:
Manning v. State,
 114 S.W.3d 922, 926 (Tex. Crim. App. 2003). 

35:
Id.

36:
There is conflicting evidence concerning when these events occurred. Katrina testified that both the letter and the discipline occurred in the summer of 2002, before she became pregnant in October 2002.  Appellant testified that the children were out of school when he discovered the letter and whipped B.P., but that he and Katrina met with Larry, his parents, and B.P. regarding the matter during the very early stages of Katrina’s pregnancy, about a month or two before B.P. got her poor report card.  B.P. received that report card in April 2003. 

37:
Appellant went to jail in August 2003, four months after B.P. made her outcry. 

38:
Hawkins v. State
, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

39:
Id.; see also Simpson v. State,
 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), 
cert. denied,
 124 S. Ct. 2837 (2004).

40:
Hawkins,
 135 S.W.3d at 77; 
Mosley v. State
, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999).

41:
We discuss these factors in greater detail in our disposition of appellant’s eighth point, in which he complains of his sentence.

42:
Tex. Code Crim. Proc. Ann.
 art. 35.16(c)(2) (Vernon Supp. 2004-05); 
Barajas v. State,
 93 S.W.3d 36, 39 (Tex. Crim. App. 2002).

43:
Anderson v. State,
 633 S.W.2d 851, 854 (Tex. Crim. App. 1982).

44:
Id.

45:
See Moody v. State,
 827 S.W.2d 875, 886 (Tex. Crim. App.), 
cert. denied,
 506 U.S. 839 (1992); 
Scott v. State,
 490 S.W.2d 578, 579 (Tex. Crim. App. 1973).

46:
Anderson,
 633 S.W.2d at 854
.

47:
See id.

48:
Woods v. State,
 152 S.W.3d 105, 114-15 (Tex. Crim. App. 2004), 
cert. denied,
 125 S. Ct. 2295 (2005); 
Best v. State,
 118 S.W.3d 857, 865 (Tex. App.—Fort Worth 2003, no pet.); 
Vosberg v. State,
 80 S.W.3d 320, 323 (Tex. App.—Fort Worth 2002, pet. ref’d).

49:
Standefer v. State,
 59 S.W.3d 177, 179 (Tex. Crim. App. 2001).

50:
See id.
 at 180 (stating that “If the victim is a nun, could you be fair and impartial?” is not a commitment question, but “Could you consider probation in a case where the victim is a nun?” is; only the latter asks for the resolution of an issue in the case); 
Vrba v. State,
 151 S.W.3d 676, 679 (Tex. App.—Waco 2004, pet. ref’d) (holding that “Who thinks that the process of being arrested would be something that might sober you up a little bit?” is not a commitment question).

51:
See
 
Tex. Penal Code Ann.
 § 12.32(a) (Vernon 2003), § 22.021(e) (Vernon Supp. 2004-05).

52:
See Jordan v. State,
 495 S.W.2d 949, 952 (Tex. Crim. App. 1973); 
Alvarez v. State,
 63 S.W.3d 578, 580 (Tex. App.—Fort Worth 2001, no pet.).

53:
See Alvarez,
 63 S.W.3d at 580; 
Moore v. State,
 54 S.W.3d 529, 542 (Tex. App.—Fort Worth 2001, pet. ref’d).

54:
463 U.S. 277, 292, 103 S. Ct. 3001, 3011 (1983), 
questioned in part by Harmelin v. Mich.,
 501 U.S. 957, 111 S. Ct. 2680 (1991).

55:
Id.,
 103 S. Ct. at 3011; 
McGruder v. Puckett,
 954 F.2d 313, 316 (5th Cir.), 
cert. denied,
 506 U.S. 849 (1992).

56:
See Alvarez,
 63 S.W.3d at 581; 
Moore,
 54 S.W.3d at 542.

57:
See Alvarez,
 63 S.W.3d at 581; 
Moore,
 54 S.W.3d at 542.

58:
See Alvarez,
 63 S.W.3d at 581.

59:
See Mathews v. State,
 918 S.W.2d 666, 669 (Tex. App.—Beaumont 1996, pet. ref’d) (“Certainly the great potentiality for mental, emotional, and physical scarring of a sexual assault victim—a child of such tender years—cannot be seriously questioned.  Short of murder, we cannot envision a crime of greater infamy perpetrated against a child . . . .”).

60:
See
 
Tex. Penal Code Ann.
 § 12.42(a) (Vernon Supp. 2004-05).

61:
The evidence at punishment showed that appellant previously had been convicted twice of credit card abuse, once for theft of a person, and twice for possession of a controlled substance. 

62:
See Alvarez,
 63 S.W.3d at 581.

63:
Tex. Penal Code Ann.
 § 3.02(a) (Vernon 2003); 
see id.
 § 3.01 (defining “criminal episode” as the commission of two or more offenses that are the repeated commission of the same or similar offenses); 
Tear v. State,
 74 S.W.3d 555, 557 (Tex. App.—Dallas 2002, pet. ref’d), 
cert. denied,
 538 U.S. 963 (2003); 
O’Hara v. State,
 837 S.W.2d 139, 142 (Tex. App.—Austin 1992, pet. ref’d) (both holding that repeated sexual assault offenses against child constitute same criminal episode for joinder purposes).

64:
Tex. Penal Code Ann
.
 § 3.04(a).

65:
Id.
 §§ 3.03(b)(2), 3.04(c); 
Matthews v. State,
 152 S.W.3d 723, 730 (Tex. App.—Tyler 2004, no pet.).

66:
Matthews,
 152 S.W.3d at 730; 
Salazar v. State,
 127 S.W.3d 355, 365 (Tex. App.—Houston [14th Dist.] 2004, pet. ref’d).

67:
Tex. Code Crim. Proc. Ann.
 art. 38.37, § 2 (Vernon 2005).

68:
See Matthews,
 152 S.W.3d at 731; 
Salazar,
 127 S.W.3d at 365.